* * * * * * * * * * *
The undersigned reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Taylor. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; and having reviewed the competent evidence of record, the Full Commission affirms the Opinion and Award of Deputy Commissioner Taylor with modifications.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to the North Carolina Workers' Compensation Act.
2. An employee-employer relationship existed between the named employee and named employer.
3. At all relevant times, defendant-employer was a qualified self-insured employer under the North Carolina Workers' Compensation Act, and Hewitt-Coleman Associates acted as its third-party administrator.
4. Employee's average weekly wage is $767.69, yielding a compensation rate of $511.82.
5. A Form 21 was approved by the Industrial Commission in this matter on May 9, 2001.
6. On August 4, 1999, plaintiff sustained an admittedly compensable injury by accident.
7. The parties stipulated into evidence as Stipulated Exhibit 1, documents including plaintiff's medical records, Industrial Commission forms, medical bills and corporate records.
8. The parties stipulated into evidence as Stipulated Exhibit 2, documents including medical records, Employment Security Commission documents and prescription information.
9. The parties stipulated into evidence as Stipulated Exhibit 3, Employment Security Commission documents.
 * * * * * * * * * * *
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the deputy commissioner in this matter, plaintiff was a 51 year old, left hand dominant female, born March 11, 1953. Plaintiff has an eleventh grade education. Prior to becoming employed with defendant-employer, plaintiff worked in highway maintenance, as a school bus driver and as a wrecker operator. Plaintiff became employed with defendant-employer Joan Fabrics in 1993.
2. On August 4, 1999, while plaintiff was working as a winder fixer, plaintiff was replacing winders with a co-worker when as she was holding up a bar, the bar fell and the force of the movement caused immediate pain to plaintiff's neck.
3. On August 4, 1999, plaintiff sustained an admittedly compensable injury to her cervical spine/back.
4. Plaintiff was treated by Dr. Allan Rosenfeld, a board-certified neurosurgeon, complaining of numbness of her hand and pain in her lower and upper left arm. Dr. Rosenfeld diagnosed plaintiff with left C7 radiculopathy and obtained an MRI which revealed a disc herniation at C6-7 compressing the left C7 nerve root.
5. On September 28, 1999, defendant-employer executed a Form 60, Employer's Admission of Employee's Right to Compensation, accepting plaintiff's August 4, 1999 injury and resulting herniated cervical disc as compensable and undertaking to pay plaintiff temporary total disability compensation at the rate of $511.82 based upon an average weekly wage of $767.69.
6. On September 29, 1999, plaintiff underwent an anterior cervical diskectomy and interbody fusion performed by Dr. Rosenfeld.
7. Following plaintiff's surgery, she had complete relief of pain in her neck and upper left extremity. On December 16, 1999 and January 18, 2000, plaintiff had some neck pain when she bent forward but normal arm strength. Plaintiff returned to work light duty for two to four hours per day on December 22, 1999. On January 18, 2000, Dr. Rosenfeld recommended work hardening/conditioning. On February 15, 2000, plaintiff had no left upper extremity pain but worsening neck pain when looking up or looking to the left.
8. On April 25, 2000, plaintiff had returned to work for full eight-hour days but was working light duty with a 20 pound lifting restriction. Plaintiff continued to have neck pain when she looked up but no left arm radicular pain. On April 25, 2000, Dr. Rosenfeld was of the opinion that plaintiff did not need further neurosurgical management, that plaintiff was at maximum medical improvement and that plaintiff retained a 10% permanent partial impairment of the neck.
9. On April 25, 2000, plaintiff had some neck pain when she looked up, but no pain in her left arm and no headaches. As of April 25, 2000, when plaintiff reached maximum medical improvement, she was not taking any prescribed medications for pain.
10. In April 2000, plaintiff was working as a winder fixer with defendant-employer. Plaintiff's duties included repairing or adjusting conveyor belts, vibrators and the electrical and mechanical components of the winding machine. Plaintiff was assisted by co-workers in carrying out her job duties. Plaintiff received assistance regularly from a co-worker to perform the heavier portions of her job.
11. Following her return to work plaintiff experienced neck pain. On February 15, 2001, plaintiff presented to David L. Kelley, Jr., a neurosurgeon, with neck pain. Additional testing by Dr. Kelley did not reveal a surgical problem.
12. On April 24, 2001, plaintiff returned to Dr. Rosenfeld complaining of persistent neck pain and with new complaints of mild weakness of the left arm and headaches which could last 24 to 48 hours that were severe and incapacitating and affected plaintiff's overall quality of life. Dr. Rosenfeld noted at that time a slightly diminished range of motion of plaintiff's neck. On May 8, 2001, plaintiff was referred by Dr. Rosenfeld to a pain management center for evaluation of neck pain and headache.
13. On May 9, 2001, the Industrial Commission approved a Form 21, Agreement for Compensation, which undertook to pay plaintiff a 10% permanent partial disability rating to her back caused by her August 4, 1999 compensable injury. Plaintiff was not represented by counsel.
14. At this time, plaintiff was working full time for defendant-employer at her pre-injury job of winder fixer. However, plaintiff was being assisted by a co-worker in performing the heavier duty tasks which were a part of her job.
15. On August 15, 2001, plaintiff presented to Dr. Thomas Ray for a pain evaluation. At that time plaintiff complained of headaches which had begun two months after her original surgery but that progressively worsened over the past four to five months and left upper extremity symptoms. Plaintiff received trigger point injections from Dr. Ray in August 2001 and October 2001.
16. On March 21, 2002, plaintiff presented to Dr. Rosenfeld complaining of stiffness in her neck with burning between her shoulder blades for approximately two months. Plaintiff also complained of pain on movement of her neck in all directions. These complaints of plaintiff were essentially new complaints. Dr. Rosenfeld was of the opinion at that time that plaintiff had possible early recurrent cervical radicular syndrome.
17. Plaintiff continued to experience pain and returned to Dr. Rosenfeld on April 25, 2002 complaining of primarily neck pain with new symptoms of left upper extremity discomfort with numbness in her second, third and fourth fingers. When plaintiff's symptoms persisted on May 14, 2002, Dr. Rosenfeld referred plaintiff to Dr. Hans Hansen for pain management.
18. On June 12, 2002, plaintiff presented to Dr. Hans Hansen, a board-certified anesthesiology and pain management doctor. Plaintiff complained of left arm pain, hand pain, that the pain was interfering with her sleep and made it difficult to work and that repetitive motion aggravated her pain as well as bending and walking. Dr. Hansen prescribed pain medication.
19. Plaintiff returned on June 20, 2002 and received a surgical epidural injection. Plaintiff had impaired motion of the neck at that time and was diagnosed by Dr. Hansen with cervicalgia and degenerative spine disease of the cervical spine.
20. Plaintiff worked as a winder fixer until July 2002. Thereafter, as a result of downsizing at defendant-employer, plaintiff was transferred to the position of creel fixer. As a creel fixer, plaintiff had to reach overhead to fix and clean creels. In performing this duty, plaintiff was unable to reach up and unable to look over her head. Plaintiff was helped in performing the creel job by her co-workers. Although plaintiff was still under a 20 pound lifting restriction, the creel fixer job was even more strenuous than her previous position as a winder fixer.
21. On July 11, 2002, Dr. Hansen diagnosed plaintiff with cervical precept syndrome i.e. pain above and below her fusion site. This is a pain that plaintiff was not experiencing at the time of her release from Dr. Rosenfeld. Plaintiff was given cervical epidural injections on July 11 and July 18, 2002.
22. In late August 2002, the plant manager at plaintiff's plant informed her that she would no longer be performing the creel fixer job and had the option of being a winder operator or a ticket desk person. As plaintiff knew the winder operator position involved lifting up to 30 or 35 pounds, plaintiff chose to perform the ticket desk person job even though that involved a pay cut.
23. At the end of August 2002, plaintiff began performing the ticket desk person job. This job required considerable writing, bending over boxes, looking up and reaching up to place tickets on boxes stacked up to eight feet high. Plaintiff also did some computer work in this position. The job duties of the ticket desk person job caused plaintiff an increase in numbness in her left arm and an increase in neck pain when looking up and looking down. This position was a very fast paced job. Plaintiff complained to her co-worker, the plant manager and her acting supervisor that the ticket desk person job was causing her to "hurt real bad".
24. On September 5, 2002, plaintiff presented to Dr. Hansen complaining of neck, shoulder and left arm pain and indicating that she was not sleeping well due to pain. At that time, plaintiff indicated that she had undergone two job changes and had been placed on third shift in a new job and that her job as well as the injections and physical therapy were making her pain worse. Plaintiff had decreased range of motion of the neck and by this time was placed on narcotic pain medicine.
25. On the third time plaintiff spoke to the plant manager about the ticket desk person job, September 6, 2002, plaintiff ended up taking a voluntary layoff from defendant-employer. Mr. Cormier testified that plaintiff indicated that she would like to take the voluntary layoff. Plaintiff took the layoff on September 6, 2002 because she was unable to perform her job duties. Plaintiff's "election" was not voluntary in the sense that she was unable to perform her job duties.
26. Following plaintiff's September 7, 2002 layoff, plaintiff received twelve months of unemployment benefits at the rate of $311.00 per week.
27. On September 12, 2002, plaintiff presented to Dr. Hansen complaining of a headache with an intensity of 8/10 as well as pain in the neck, especially the left side with sharp stabbing continuous pain with numbing and tingling in her left upper extremity. At that time, plaintiff had experienced daily headaches for the prior three weeks and her neck pain was worse with bending and working.
28. By October 10, 2002, plaintiff was experiencing neck pain and numbness of her left arm which worsened if she held it up to do anything. Plaintiff began to have a new complaint of pain going from her neck straight down her back below the level where it had been in the past. Plaintiff was unable to sweep, drive or do dishes.
29. On November 16, 2002, Dr. Hansen was of the opinion that plaintiff had cervicogenic headache which was caused by her original compensable injury or the surgery which was necessitated thereby.
30. Plaintiff continued to treat with Dr. Hansen and continued to experience neck pain which was often severe, serious headaches and drowsiness caused by her pain medications. Plaintiff had progressed from being released by Dr. Rosenfeld with no prescription medicines to constantly being on narcotic medication. Plaintiff continues to be treated by Dr. Hansen with injections and medications.
31. On August 14, 2003, plaintiff underwent a functional capacity evaluation which revealed consistent performance with some self-limiting due to pain. The FCE indicated that plaintiff could perform at the medium level.
32. On March 2, 2003 plaintiff presented to Dr. Joshua S. Miller, a board-certified anesthesiology and pain management doctor. Plaintiff presented with multiple trigger points (muscle spasms) in the back of her neck and shoulders, her neck was diffusely tender to the touch and she had some weakness in her left upper extremity. Dr. Miller diagnosed plaintiff with cervical degenerative disc disease with cervical radiculopathy, cervical post-laminectomy syndrome and myofascial pain syndrome (chronic muscle spasms). Dr. Miller was of the opinion that these conditions were caused by plaintiff's compensable injury and the resulting surgery. Dr. Miller was of the opinion that plaintiff should have a CT myelogram which, if positive, should result in a neurosurgical consultation. If the test was negative, plaintiff should have cervical epidural steroid injections with physical therapy, and if no response to those procedures was forthcoming, plaintiff should consider a spinal cord stimulator or even as a last resort a catheter for infusion of medicine to the spine. Dr. Miller was further of the opinion that plaintiff had a substantial risk of requiring future medical treatment, medication and pain management in the future. Dr. Miller agreed with a 10 to 15% rating for plaintiff's cervical spine and referred her back to Dr. Hansen for maintenance.
33. On March 23, 2004, plaintiff presented to Dr. Otis Curling, a neurosurgeon. Plaintiff presented complaining of constant neck pain with some headaches and intermittent discomfort and paresthesis of the left arm as well as the thumb, index and long finger. Plaintiff complained of pain with any activity especially bending. Plaintiff indicated that she had returned to work after her surgery and experienced continuing problems which worsened to the point that there was too much pain for her to continue working. Dr. Curling found that plaintiff had moderate diminished range of motion in her neck. Dr. Curling diagnosed plaintiff with myofascial pain syndrome with secondary cervicogenic headaches and post-compressive neurogenic pain syndrome in her left arm. Dr. Curling was of the opinion that these conditions were directly related to plaintiff's compensable injury.
34. Dr. Curling was of the opinion that plaintiff's August 2003 FCE was a valid test but over estimated plaintiff's ability to work on a regular basis for eight hours, and it was his opinion that plaintiff could not maintain employment at that level. Dr. Curling recommended employment for plaintiff in the light capacity range, but was of the opinion that plaintiff is capable of some work. Dr. Curling was of the opinion that plaintiff's activities should be limited to no repetitive upper body work, no prolonged sitting or standing and occasional maximum lift of 35 pounds.
35. Dr. Curling was of the opinion that plaintiff is not a surgical or diagnostic candidate but bears a substantial risk of needing medical management with medication and activity modification with regular visits to a doctor. Dr. Curling was of the opinion that plaintiff had a 15% permanent partial disability of the back because she has substantially more problems with her back than she had following her original release at maximum medical improvement by Dr. Rosenfeld in April 2000.
36. Dr. Hansen continues to see plaintiff and continues to prescribe narcotic and non-narcotic pain medicines as well as Prozac and Ambien.
37. At plaintiff's last visit, Dr. Hansen was of the opinion that plaintiff is in a management mode and will need to be on medication for the foreseeable future and will need to be seen by a doctor for the management of her pain and for treatment. Dr. Hansen is of the opinion that plaintiff's complaints of pain are genuine. Dr. Hansen is of the opinion that plaintiff is able to return to some type of work. Dr. Hansen believes that plaintiff is a candidate for retraining for a different type of work.
38. Dr. Rosenfeld is of the opinion that while there has been no objective change, i.e. changes on film, in plaintiff's condition between her 2001 rating and her May 14, 2002 referral to the pain center, plaintiff's subjective complaints have increased and worsened during that period. Dr. Rosenfeld is further of the opinion that plaintiff is truthful in her complaints.
39. Susan Curtis Smith is the nurse case manager assigned to plaintiff's claim. Ms. Smith worked with plaintiff twice, first in 2001 from July 25, 2001 to August 30, 2001 and the second time in 2002 starting on November 15, 2002. Ms. Smith believes plaintiff to be a truthful person and believes plaintiff has real pain. Plaintiff told Ms. Smith that she was having pain doing the ticket desk person job and took a voluntary layoff.
40. Ms. Smith has observed plaintiff's pain worsen since she opened plaintiff's case in November 2002.
41. Plaintiff has attempted to find jobs through the Employment Security Commission but has been unsuccessful in her efforts. Plaintiff did obtain work at Q-Express convenience store in late December 2003 and early January 2004. Plaintiff worked two or three days total for approximately two hours each day. Plaintiff was required to stock shelves, work a cash register and hand items through a drive through window. Plaintiff was unable to perform this job due to pain and was terminated. Plaintiff was not paid for this work.
42. On August 14, 1999, plaintiff sustained an admittedly compensable injury to her cervical spine.
43. On April 25, 2000, plaintiff reached maximum medical improvement from that injury and retained a 10% permanent partial impairment to her cervical spine with a 20 pound lifting restriction.
44. On May 9, 2001, the Industrial Commission approved a Form 21, Agreement for Compensation, in which defendant agreed to pay plaintiff for her 10% permanent partial impairment of the cervical spine. On May 9, 2001, this approval became an Order of the Commission.
45. Following reaching maximum medical improvement, plaintiff's symptoms gradually began to worsen until on September 7, 2002, plaintiff was no longer able to work due to pain in her neck and arm, numbness in her left arm and severe headaches.
46. By no later than September 7, 2002, plaintiff had sustained a material, substantial and severe change of condition in that her pain had increased to the point that she was unable to continue her employment with defendant-employer.
47. Since September 7, 2002, to the extent that she has been able due to her pain, plaintiff has looked for work but been unsuccessful in obtaining the same. Plaintiff's efforts have been diligent and reasonable.
48. As a result of her change of condition, plaintiff is entitled to temporary total disability compensation at the rate of $511.82 per week from September 7, 2002 and continuing.
49. Plaintiff has received unemployment benefits, and defendant-employer is entitled to a credit for the same.
50. The medical treatment which plaintiff has received since her compensable injury, including but not limited to the treatment received from Dr. Hansen, was reasonably necessary to effect a cure, provide relief and lessen plaintiff's period of disability and plaintiff is entitled to receive the same from defendant.
51. There is a substantial likelihood that plaintiff will require future medical treatment as a result of her compensable injury.
52. Plaintiff is entitled to receive medical treatment for her compensable injury including for her neck pain, arm pain and numbness and headaches and any other related conditions in the past and in the future.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. By no later than September 7, 2002, plaintiff had sustained a material, substantial and severe change of condition in that her pain had increased to the point that she was unable to continue her employment with defendant-employer. N.C. Gen. Stat. § 97-47.
2. As a result of her change of condition, plaintiff is entitled to temporary total disability compensation at the rate of $511.82 per week from September 7, 2002 and continuing. N.C. Gen. Stat. § 97-29.
3. Plaintiff has received unemployment benefits, and defendant-employer is entitled to a credit for the same. N.C. Gen. Stat. § 97-42.1.
4. The medical treatment which plaintiff has received since her compensable injury, including but not limited to the treatment received from Dr. Hansen, was reasonably necessary to effect a cure, provide relief and lessen plaintiff's period of disability and plaintiff is entitled to receive the same from defendant. Plaintiff is entitled to receive medical treatment for her compensable injury including for her neck pain, arm pain and numbness and headaches and any other related conditions in the past and in the future. N.C. Gen. Stat. § 97-25.
 * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 AWARD
1. Defendant shall pay temporary total disability compensation to plaintiff at the rate of $511.82 per week for the period from September 7, 2002 and continuing until further Order of the Commission. Portions of this amount have accrued and shall be paid in a lump sum. These amounts are subject to an attorney's fee approved in Paragraph 3 of this Award. Defendant is entitled to a credit for unemployment compensation received by plaintiff.
2. Defendant shall pay all medical expenses incurred or to be incurred by plaintiff as a result of her compensable injury to the extent they are reasonably designed to provide relief, effect a cure or lessen plaintiff's period of disability.
3. A reasonable attorney's fee of 25% of the compensation due plaintiff under Paragraph 1 of this Award is approved for plaintiff's counsel and shall be paid directly to plaintiff's counsel by defendant by paying plaintiff's counsel 25% of accrued amounts and every fourth check thereafter.
4. Defendant shall pay the costs.
This the ____ day of January, 2006.
 S/____________ BUCK LATTIMORE CHAIRMAN
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/_____________ PAMELA T. YOUNG COMMISSIONER